[No. 30568. *En Banc.* May 13, 1949.]

THE STATE OF WASHINGTON, on the *Relation of Puget Sound Navigation Company et al., Appellants,* v. THE DEPARTMENT OF TRANSPORTATION *et al.,* *Respondents.*[1]

[1]Reported in 206 P. (2d) 456.

*Bogle, Bogle & Gates, Edward G. Dobrin,* and *M. B. Crutcher (Hart, Spencer, McCulloch & Rockwood* and *Fletcher Rockwood,* of counsel), for appellants.

*The Attorney General, E. K. Murray, Special Assistant,* and *Jess N. Rosenberg, Assistant,* for respondents Department of Transportation *et al.*

*Hile, Hoof & Shucklin,* for respondents Northwest Washington Community Council *et al.*

BEALS, J.—The appeal in this case brings before us for review a judgment of the superior court affirming, with one exception, an order of the department of transportation of Washington, dated July 3, 1947, entered in departmental cause No. T-8100, which order fixed rates to be paid by patrons of appellant Puget Sound Navigation Company (which will hereafter be referred to as the company or ap-

pellant), an intrastate common carrier engaged in the business of transportation of passengers, vehicles, and freight.

The judgment appealed from was entered in a proceeding instituted by the company before the superior court, which brought the order of the department before that court for review.

Northwest Greyhound Lines, Inc., a corporation, was also doing business as a common carrier, operating motor busses which were transported across Puget Sound by appellant's vessels. This corporation did not appear before the department, but, feeling aggrieved by the action of the department above referred to, also brought the order before the superior court for review, contending that, as to it, the order was void because entered without due process of law.

The two matters were consolidated for hearing before the superior court, which upheld this contention of Northwest Greyhound Lines, Inc., and reversed the order as to that company. From this portion of the judgment of the superior court, respondent department prosecuted no appeal.

On the hearing before the department, the following persons represented the department: Paul Revelle, director; Joseph Starin, chief examiner; F. L. Jager, rate expert and chief of tariff section, and Stewart Krieger, chief accountant. The department was also represented by Frederick J. Lordan, Esquire, and Frank W. Foley, Esquire, members of the staff of the attorney general.

Appellant Puget Sound Navigation Company was represented by Fletcher Rockwood, Esquire (of Hart, Spencer, McCulloch and Rockwood), and Edward G. Dobrin, Esquire (of Bogle, Bogle and Gates), its counsel, and by Captain Alex M. Peabody, its president.

Several interveners appeared before the department, including Northwest Washington Community Council, by Hile, Hoof, and Shucklin, its attorneys; Masters, Mates and Pilots, and Inlandboatmen's Unions, by Captain John M. Fox, business manager, Clifford D. O'Brien, Esquire, economic counsel, and Carl Luckerath, Esquire, attorney;

Bremerton Central Labor Council, by John C. Merkel, Esquire, its attorney; Peninsula Tariff Bureau, by H. D. Williams, Esquire, traffic adviser; Boilermakers' Local 104, by W. G. Nadeau and R. James Malone, delegates; Sexton Auto Freight, by J. R. Sexton, its owner, who also represented the Bremerton Chamber of Commerce; Vashon-Maury Island residents, by Charles H. Law; Tacoma Chamber of Commerce, by Donald Wallace, its traffic manager, and Bremerton Chamber of Commerce, by Ralph Purvis, Esquire, its attorney.

Northwest Washington Community Council and other groups appeared before the superior court in support of the departmental order, and before this court are named as additional respondents.

Before the superior court, the respondent department was represented by the attorney general and members of his staff, and by E. K. Murray, Esquire, special assistant attorney general.

C. R. Lonergan, the company's "tariff agent," was also a party before the superior court and is an appellant before this court, but, in this opinion, we shall refer to the company as though it were the sole appellant.

Appellant is a Nevada corporation, maintaining an office at Carson City, Nevada, but conducting its business from an office in Seattle. For some years, it has engaged in business in the state of Washington as a common carrier, within the purview of Rem. Rev. Stat., § 10339 [P.P.C. § 819-1] *et seq.*, pursuant to a certificate of public convenience and necessity granted by the department. It is engaged in both intrastate and interstate business, operating boats for the carriage of passengers, vehicles, and freight between many points on Puget Sound, and also between Seattle and Victoria, British Columbia. It conducted a considerable intrastate freight business, operating a fleet of twenty-two vessels and two barges, and, also, under the name of "Bremerton Transit Lines," operated ten motor coaches in connection with its ferry service between Seattle and Port Orchard, Bremerton, and various points on Bainbridge Island.

In its proceeding, identified by department No. 7040, the then department of public service, the predecessor of the department of transportation, conducted extensive investigations concerning the company's business and, by an order bearing date September 22, 1937, prescribed intrastate rates to be charged for the services rendered by the company and other ferry companies, these rates being referred to in the record in the case at bar as the "7040 rates."

In fixing the rates above referred to, the department considered all of the company's operations as one transportation system, engaged in serving the public, and did not consider each route as an independent operation.

The order referred to contained the following paragraph regarding the Puget Sound transportation situation:

"The transportation problems of the Puget Sound Area generally, are not the problems of any particular locality or of any particular route. Our habit of moving about freely and frequently and the enlargement of the situs of our business and social activities make the resident of Bellingham neighbor to the citizen of Bremerton, and the dairyman at Sequim. All of us need adequate service in all parts of the Sound country. One may travel the Vashon route today, use the Bremerton service tomorrow, the Ballard-Ludlow route another time, and journey to Orcas Island for the week-end. The Vashon Island resident who works in Seattle, or sells his produce in its markets is vitally interested in the development of all the territory which both supports and is dependent upon the metropolis. Whether he realizes it or not he is deeply concerned with the problem of promoting and maintaining adequate transportation facilities in all parts of the Sound country. No one community or area lives in, of, and by itself. This truth is recognized every day when we use general tax money to build expensive roads and bridges in every part of the land without regard to the amounts paid into the Treasury by the people and territory immediately affected."

The description also applied to the company's boats plying between Seattle and Victoria, in so far as the intrastate business of that route was concerned.

During the late war, the business of the company greatly increased, and the company voluntarily, for a definite period

only, reduced its charges for transportation, but the 7040 rates were again put into effect as of January 1, 1947.

During the year 1945, the company transported, in the course of its intrastate operations, 10,160,164 passengers and 1,622,246 automobile units. During the year 1946, passengers carried numbered 7,760,456, and automobile units, 1,-947,037. It appears that, during the year 1938, the total mileage of the transportation system amounted to 721,177 miles, which figure, during the year 1946, increased to 1,156,359 miles.

After the close of the war, the company's business declined, more particularly in the carriage of passengers, and, at the same time, the operating expenses increased.

At the beginning of the year 1947, the company found the volume of its business declining, while its operating expenses were still increasing, and accordingly, during January, 1947, filed with the department a new tariff containing rates for passenger and motor vehicle transportation, and for other miscellaneous services over its intrastate routes, the rates in this tariff being approximately thirty per cent higher than the 7040 rates previously in effect.

February 14, 1947, the department, upon complaints by several civic organizations, and upon its own motion, pursuant to Rem. Rev. Stat., § 10422, filed with its appropriate officer a complaint alleging the recent filing of new rates by the company and its tariff agent, C. R. Lonergan, who were made parties respondent in the proceeding.

The complaint alleged that, by the January, 1947, tariff, the company had permanently increased its rates by approximately thirty per cent; that the rates for carriage of passengers, vehicles, and freight, and the rules, regulations, practices, and schedules of the company were, in many instances, unfair, unjust, and unreasonable; that discriminatory schedules and routes were maintained by the company, contrary to the best interests of the traveling public and other patrons, and that, in order to fix just and reasonable rates, fares, and charges, and to determine and fix fair, reasonable, proper, and adequate rules, regulations, practices, equipment, facilities, service, schedules, and routes,

" . . . it is necessary that the fair value of the properties of the Puget Sound Navigation Company used and useful in rendering public service be determined and to investigate all phases of respondent's business and activities."

It was also alleged in the complaint that a preliminary investigation by the department's accountants and other officers had revealed that the company's operation costs had increased and that revenues had decreased, the complaint containing estimated losses suffered by the company during the months of November and December, 1946, and January, 1947; that the trend of increasing costs and decreasing revenues was continuing and justified immediate and temporary relief to the company, pending thorough investigations by the department, and that, for the reasons stated, the company should be authorized to file temporary rate increases upon less than statutory notice, these rates to become effective not earlier than February 15, 1947, and to terminate September 14, 1947, or at an earlier date if ordered by the department. The complaint continued:

" . . . that as a condition of being permitted to file these temporary rates the Puget Sound Navigation Company should be required to make provision for refund of any amounts paid by patrons for transportation service which may be determined by the Department, after the hearings ordered are completed and orders issued, to be in excess of reasonable fares and charges; that receipts which will be issued with each ticket purchased should be honored by the Puget Sound Navigation Company to the extent that the Department may determine and order that the temporary filed rates are in excess of reasonable rates and charges; that revenues equivalent to the difference between revenues collected at rates and charges in effect on and after February 15, 1947, and revenues that would have been received at rates or charges in effect on February 14, 1947, should be impounded to provide a fund from which possible refunds of excess charges may be made, or in the alternative, provide a bond as hereinafter ordered."

On the day the complaint was filed, the department (pursuant to Laws of 1941, chapter 162, § 1, p. 442, Rem. Supp. 1941, § 10424) entered its order directing a full and complete

investigation concerning all matters alleged in its complaint, and suspended further operations on the part of the company under the increased rates contained in its tariff filed during the month of January, 1947. The order also directed that no changes should be made in the company's tariffs or schedules until the termination of the investigation ordered by the department and the proceedings in connection therewith, and that the company should be allowed to collect the approximately thirty per cent increased rates as temporary rates until September 14, 1947, unless otherwise ordered by the department at an earlier date. (By its order of July 3, 1947, the department "otherwise ordered," *infra*.) The order continued:

"The permission herein granted to publish on one day's notice temporary increased fares and charges is conditional upon and subject to the following provisions to be contained in the special supplement to respondent's tariff No. 1, W. D. T. No. 1: All fares and charges named on revised pages enumerated under paragraph III herein are temporary rates and will expire with September 14, 1947, unless sooner cancelled, changed or extended by order of the Department. On and after the effective date of increased fares on the revised pages numerated above, refund receipts will be issued with each ticket sold indicating the amount paid and containing the following statement: 'Retain this receipt. It may be valuable. In accordance with orders of the State Department of Transportation the rates charged by the Puget Sound Navigation Company and now in effect are temporary and if found excessive after investigation and public hearing by the Department of Transportation of Washington, this evidence of purchase may be used in establishing refund claims. Puget Sound Navigation Company, By Alex M. Peabody, President.' If the Department of Transportation finds after investigation, hearing or hearings and the issuance of an order that the fare or charge paid is excessive and that a lower fare or charge is reasonable the Puget Sound Navigation Company will refund the difference to the holder of such receipt if presented at the offices of the Puget Sound Navigation Company, Colman Ferry Terminal, Seattle 1, Washington, on or prior to December 31, 1947. Refunds will be paid without proof that the holder of the receipt actually paid such fare or charge.

"IT IS FURTHER ORDERED That if the special supplement referred to above is filed, all sums collected by the Puget Sound Navigation Company on and after February 15, 1947, for passenger and ferry service in excess of the rates and charges effective in tariffs effective February 14, 1947, shall be impounded and deposited in a special account in the Pacific National Bank of Seattle, Washington, from which said account no withdrawals shall be made for any purpose unless the Puget Sound Navigation Company shall first file with the Department of Transportation and secure approval of a bond in an amount equivalent to said withdrawal or until further order of the Department of Transportation, which impounded fund or bond shall serve as a guarantee of the payment of refund claims if the Department finds that the temporary rates effective on and after February 15, 1947 are excessive.

"IT IS FURTHER ORDERED That if the Department finds that the temporary rates effective on and after February 15, 1947 are excessive, in the event refund claims are not made by all receipt holders within the period covered by the statute of limitations, any excess remaining in the impounded fund or represented by any bond as aforementioned shall not be considered as property of the Puget Sound Navigation Company and its disposition shall be determined by the Department of Transportation at a future time."

A tariff stating the temporary rates placed in effect by the department was filed by the company, in accordance with the departmental order, and, subsequent to February 15, 1947, the company charged and collected rates as provided in this temporary tariff, in amounts practically thirty per cent in excess of the 7040 rates.

Pursuant to its order, the department proceeded with its investigation of the company's business, conducting a study of every phase of appellant's properties and operations. This was accomplished by members of the department's accounting service, under the supervision of its chief accountant, Stewart Krieger, and by a number of inspectors employed by the department, who rode the ferries, boats, and other transportation facilities operated by the company, checking the services performed by the company. It does not appear that technical experts, qualified to value appellant's operating properties, were employed.

The investigation resulted in a report of two hundred forty pages, which is exhibit No. 1 of the department's record. From this report, it appeared that it was not possible at that time to make an estimate concerning the salaries and wages which the company would pay during the year 1947, for the reason that labor disputes were in progress and the question of the wages to be paid by the company in the future had been submitted to arbitration before Harold A. Seering, a Federal wage arbitrator.

Concerning the matter of wages, the company and two unions had entered into preliminary agreements, one, with the Masters, Mates and Pilots Union, dated January 1, 1947, and the other, with the Inlandboatmen's Union, dated February 20th following. Section 5 of each agreement read as follows:

"The Washington State Department of Transportation has under consideration an application by the Employer for rate increases. The parties have agreed that the Arbitrator appointed by the Conciliation Service of the United States Department of Labor shall sit as an observer in any hearings conducted upon that application for rate increases and that the Hearing Officer of the State Department of Transportation shall be permitted to sit as an observer at the arbitration hearings. The record made before the State Department of Transportation shall be considered by the Arbitrator to be a part of the record of the arbitration hearing, and the record made at the arbitration hearing shall be considered, in so far as the parties to this agreement are concerned, to be a part of the record made before the State Department of Transportation. Prior to making his Findings and rendering his Award the Arbitrator may take into consideration the record made before the State Department of Transportation and the tentative Findings and Rulings, if any, of the State Department of Transportation or its Hearing Officer, and the Arbitrator shall, prior to rendering his Findings and Award, advise the State Department of Transportation or its Hearing Officer of his tentative Findings and Award. The Findings and Award of the Arbitrator shall be finally rendered prior to the final determination of the State Department of Transportation upon the Employer's pending application for rate increases."

The parties also agreed that the award made by the arbitrator would be accepted both by the company and by the unions.

The department completed its preliminary investigation during the month of May, 1947, and, after notice to the company and to all persons and organizations who had advised the department of their interest, held public hearings in the city of Seattle, commencing June 4, 1947, and terminating June 18th following. These hearings were reported, and are contained in a transcript of more than seventeen hundred pages of testimony, together with forty-five written exhibits, many of which are voluminous. Mr. Seering, the Federal arbitrator, attended the hearings as an observer.

From the departmental record, it appears that, in addition to many other complicated matters at issue between the department and the company, residents of the city of Bremerton and adjacent territory vigorously contended that the Bremerton-Seattle service, which was financially remunerative, should, for rate-making purposes, be segregated from the rest of the system and thereby be relieved from contributing to possible losses suffered by other routes operated by the company.

Hearings in the labor dispute between the company and the unions were held in Seattle during May, 1947, the record of these hearings not indicating that any representative of the department attended them as an observer. A transcript of these hearings is attached to the department's record as exhibit No. 44, and discloses, on p. 467, the following:

"CAPTAIN Fox [representing the unions]: . . . I think in the arbitration agreement it should be noted that the hearing officer of the State Department of Transportation was permitted to sit in here as observer and I think the Arbitrator certainly knows that his absence has been quite conspicuous. THE ARBITRATOR: Were they notified? MR. O'BRIEN: We have had recent conferences with the Chief Auditor of the State Department of Transportation, who with his staff has been working right here on the records of the Puget Sound Navigation Company, and he has been

fully apprised of the fact that these hearings were going on. CAPTAIN Fox: In these discussions, however, with this Chief Accountant Krieger he did make a statement that the Department was not notified of these hearings. That raised the issue as to whose responsibility it was to notify the State Department that such hearings were taking place. Of course, I contended that it was the responsibility of management. The Unions are not under the jurisdiction of the State Department. MR. DOBRIN: We knew that they were not here the first day, and we provided for an extra copy of the record for them. . . . After the rate hearing is over he [the arbitrator] shall take into consideration the record before the State Department of Transportation, and it further says that the Arbitrator shall prior to rendering his findings advise the State Department of Transportation. It tells what he is supposed to do and that is what we expect him to do."

Mr. Seering, the government arbitrator, filed his written award July 3, 1947, appearing as exhibit No. 43 of the department's record.

The hearings before the department were continued after the close of the hearing in the labor dispute, and, in the course of the hearings before the department, the company introduced evidence showing the estimated increase in wages for the year 1947 to be in excess of $286,000, based upon certain concessions previously made by the company. However, questions of great importance concerning the "forty-hour week," the "five-consecutive-day week," and the matter of overtime pay had been left open for future consideration.

Mr. Seering, by his final award, denied the unions any increase in wages, as had been requested, but, as to the matters above referred to, granted some of the unions' demands. It was recognized that the arbitrator's award would result in increased operating costs to appellant, as is shown by the following, quoted from the award:

"The arbitrator has not been unmindful of the fact that the award on hours is in effect a very substantial wage increase and that considered in connection with the wage increase already given, it constitutes a substantial improvement for the employees involved. For the foregoing reasons the wage increases are denied."

The fact that wages constituted a very uncertain element during the investigation by the department, is frequently disclosed by the record, from which we quote. Mr. Krieger, the department's chief accountant, testified as follows:

" 'Then, not knowing just what the wage rate will be in the future, it is obviously impossible for any estimate to be made of future wage costs. . . .'

"I did not, however, give consideration to the present-day operating expenses, and I deliberately didn't do it because the matter of present-day operating expenses is entirely too nebulous . . .

"I was faced with a very difficult situation. Wages are in controversy. The actual operating expenses of the Company are nebulous. . . ."

From the departmental record, it clearly appears that, in determining the tariffs to be charged by the company, the matter of the wages which it would be required to pay was extremely important, the increases demanded by the unions being very substantial.

In appellant's brief, appears a tabulation showing, as appellant contends, the "increase in annual wage costs due to increases granted prior to the award and as increased by the award." From this statement, it appears that, during the year 1946, appellant's payroll totaled $1,551,352.12.

June 11, 1947, during the course of the departmental hearing, director Revelle presiding, a discussion occurred among counsel, Mr. O'Brien, representing the Masters, Mates and Pilots, and Inlandboatmen's Unions, Mr. Dobrin, representing the company, and Mr. Lordan, representing the department. In response to a question by Mr. O'Brien, Mr. Dobrin stated that a transcript of the record made before Mr. Seering, together with the exhibits introduced, and Mr. Seering's award, when made, would be supplied to the department. Mr. Lordan, on behalf of the department, then said:

"Well, may I notify all parties that at the proper time— this record will be kept open to the end that the arbitrator's award may be received by the Department and considered?"

Mr. Dobrin answered: "Yes, we assumed that that would be true."

Later, Mr. O'Brien called attention to the fact that there was pending before the arbitrator the question of the unions' proposal for a forty-hour week, as opposed to the current forty-eight-hour week, and other proposals concerning hours of labor, "straight time," and so forth. The colloquy then continued as follows:

"MR. O'BRIEN: . . . I think it almost impossible to make any intelligent estimate until we have the decision of Mr. Seering. At that time, if it would be of aid to the Department, we would be glad to sit down with Captain Peabody or his counsel or any other representatives of the company and attempt to give the Department the best thoughts of both parties as to the relation of straight to overtime thereafter, but until we have that decision, I don't see how we could intelligently do it. DIRECTOR REVELLE: I wonder if we could have a stipulation between counsel that Captain Fox's testimony can be entered in the record if we hold the record open after we close the hearing at this point to accept such testimony as he will be able to give after the arbiter hands down his decision? MR. DOBRIN: Well, not necessarily as to what he would be able to give, but what he would be able to give on the same subject. DIRECTOR REVELLE: Yes, that is right. MR. LORDAN: I would suggest that perhaps counsel might be able to work out something along that line so if there is any conflict in the testimony both conflicting statements may be filed. MR. DOBRIN: I think that is right. MR. ROCKWOOD [other counsel for appellant]: Well, the only question that comes to my mind is this, and I may be speaking out of turn: it is a question of which came first, the hen or the egg. Now, is the arbiter requested to make available a copy of his report after he hands down his award? DIRECTOR REVELLE: That is right. MR. ROCKWOOD: Before the Department hands down its order. MR. O'BRIEN: Yes, Mr. Rockwood, that is my agreement, in substance. It provides that the arbiter shall sit in at these hearings and that his award be handed down prior to the determination by the Department. MR. LORDAN: That is our understanding. EXAMINER STARIN: The understanding is then that subsequent to the arbiter's award, statement will be made by Captain Fox and such statements as the company may wish to enter and that those both will be

presented to the Department and could be considered by the Department as part of the record in this proceeding."

At the close of the hearing, June 18, 1947, the departmental record discloses the following:

"Mr. Lordan: And then I want to reserve a place in this order, in this record, for the estimate or compilation of the future wage bill which it was understood and agreed would be printed by both Captain Peabody and by Captain Fox, which was formally agreed upon in this record. Mr. Rockwood: That is satisfactory. You mean the — Mr. Lordan: (Interposing) When and after the arbitration. Mr. Rockwood: As it will result from the arbitrator's award? Mr. Lordan: That is right. Mr. Rockwood: No objection. Mr. Lordan: I would like to reserve an exhibit number in this record for the report of the Labor Arbiter when completed and issued. Mr. Rockwood: No objection. Mr. Lordan: That completes the material that I had to incorporate in this record. Examiner Starin: That exhibit number to be reserved would be 43. (No. 43 reserved for Complainant's exhibit to be submitted at a later date.) Mr. Lordan: The State has nothing further. Examiner Starin: This record will be considered as completed with merely the Labor Arbitrator's report to be considered as Exhibit No. 43 when received. Mr. Lordan: We likewise have an understanding upon the record, Mr. Examiner, which was made before when Captain Fox was on the witness stand, and which I am sure Captain Peabody agreed to in connection with this matter, that when the arbitration award is completed and made and filed with the Department, that there was to be a statement filed or an exhibit which was to show on behalf of both Captain Fox and Captain Peabody what the effect of that award was in dollars of operating expense upon the Puget Sound Navigation Company for the year or for any period, any stated period, after the award was made. Is that correct, Captain Peabody? Mr. Peabody: That is right. Mr. Lordan: So that there will have to be a reservation of both documents, and on behalf of the Department's staff, I will undertake to see that as far as that exhibit is concerned, or those exhibits which are not distributed to all parties of counsel, that the staff will undertake that responsibility and duty.

"Examiner Starin: The Department has just been considering whether or not there should be a definite time within which the arbiter's report should be received by the De-

partment in order to receive consideration in this case, as otherwise it might be held open indefinitely. MR. LORDAN: Well, I agree that we are probably leaving the record in an indefinite stage without any such stipulation. However, I think that it must be necessary to be borne in mind that the Labor Arbitrator's agreement as I understand it, with the principals, is that it be filed with the Department for its consideration in its determination of this rate case, which I anticipate everybody will agree is one of the factors that the Department is going to have to take into account, but I can only report here and say that I understand that the Arbitrator is giving that matter very serious consideration and anticipates that he will be able to get that out. . . .

"MR. PURVIS: Mr. Director, I would like to state that there should be some time limit on this as has been stated, and in addition, I think the record should also show that the Department's accountant or auditor should also prepare a statement as to the cost effect on the company, and the Department shouldn't have to rely purely on the statement which is to be submitted by the company as to the cost effect of these wages. MR. LORDAN: Well, I agree that presents practical difficulties, Mr. Purvis, but the Labor Arbitrator's award will be received without any reference to what Captain Peabody or Captain Fox's opinion is with respect to it. The evidence of the record has already closed as to basic testimony relative to hours worked and man hours and everything with respect to these boats. I take it that there would be no objection to them expressing their opinion as to what that additional award, if any, would amount to, but from this record and from the award itself, I think that computations could be made by the Department. DIRECTOR REVELLE: They will be, Mr. Lordan, what is it supposed to be that Mr. Dobrin was supposed to furnish for this record? Might I understand exactly? MR. LORDAN: First, I understand that he is to furnish the record—and by 'record' I mean the transcript of evidence and the exhibits in the hearing before the arbitrator. MR. ROCKWOOD: Correct. DIRECTOR REVELLE: And you want an— MR. LORDAN: (Interposing) Exhibit number. DIRECTOR REVELLE: (Continuing) —Exhibit number reserved for that. MR. LORDAN: That is right; and second, Captain Peabody— DIRECTOR REVELLE: (Interposing) It will be Exhibit 44 reserved. (Complainant's Exhibit No. 44 was reserved for exhibit to be furnished at a later date as hereinabove provided.) . . .

"EXAMINER STARIN: With reference to Exhibit No. 44 and Exhibit No. 45, those should be supplied to the Depart-

ment immediately and with reference to Exhibit No. 43, which is to be the report of the Labor Arbitrator and also the statement by the company concerning that, and statement by Captain Fox concerning that, the Department will rule that that must be filed with the Department within a reasonable time to receive consideration."

The hearing before the department ended June 18, 1947. Mr. Seering, labor arbitrator, filed his award July 3, 1947. A copy is included in the departmental record, marked exhibit No. 43, that being the number which was reserved for the award, as above disclosed.

July 3, 1947, the same day that Mr. Seering made his award, the department, in its cause No. T-8100, made and filed its findings of fact, its opinion, and its order, the opinion reciting that "The department has received and reviewed the award of the labor arbiter . . . ."

It is apparent that, as the award was not filed until July 3, 1947, neither appellant nor the unions represented by Captain Fox and others was afforded any opportunity to file (as it was anticipated they would) statements or arguments concerning the effect of the labor award upon the business of the company and its financial situation. Appellant did file such a statement July 21, 1947, contending that the additional operating costs which would result from the agreed wage increases, plus the increased wage payrolls resulting from Mr. Seering's award, would amount to more than $933,000, exclusive of vacation costs. The representatives of the unions filed no arguments, and, so far as disclosed by the record, the statement filed by appellant was not considered by the department.

Appellant contends that, July 23, 1947, it filed with the department a petition for reconsideration or rehearing, and that the department denied the petition, after the proceeding was removed to the superior court. The departmental record contains no such petition on behalf of appellant as that to which reference is made.

By its order, filed July 3, 1947, the department directed, *inter alia,* that the temporary rates, as filed by appellant during the month of January, 1947, should be permanently

suspended as of August 3, 1947; that, as of that date, appellant would be permitted to raise its rates approximately ten per cent in excess of the 7040 rates, and that, October 1, 1947, one ferry was to be removed from the Seattle-Bremerton run, the order also providing for interline tickets for certain routes. Concerning the refunds, the order contained the following provision:

"(6) IT IS FURTHER ORDERED That Puget Sound Navigation Company shall refund to the holders of the refund receipts, referred to in the department's order in this cause of February 14, 1947, and in accordance with Supplement No. 1 to Puget Sound Navigation Company Passenger and Ferry Tariff No. 1, W. D. T. No. 1, of C. R. Lonergan, Agent, for each receipt presented for refund, the proper amount as shown in Appendix 'B' of this order."

The Appendix "B" referred to is a table of refunds in cents to be paid to the holders of receipts for tickets purchased over the several transportation routes operated by appellant.

The department made findings of fact, which may be epitomized as follows:

(1) Against the contention of patrons in the Bremerton area that each route should be considered independently, the department found that all operations of appellant on Puget Sound should be considered as one complete transportation system, with the exception of the Seattle-Victoria route.

(2) The department found that the valuation of appellant's operating properties should be made on the basis of the actual purchase price paid by appellant for properties which had previously been used by others, with depreciation allowed according to the setup on its books, disregarding the original cost of the properties when purchased or constructed by others and when first devoted to public service, and that, by applying this method, the fair value of the property used and useful in rendering intrastate public service was $4,480,821.77, as compared with $10,242,489.68 under the original cost method of valuation. The department eliminated from the rate base the vessels

used for the Seattle-Victoria route, certain adjustments on the vessels "Chippewa," "Kitsap," and "Vashon," as well as the cost of the vessels "Iroquois," "Sacramento," and "Vashonia," which were to be retired or sold within the near future, and also took into consideration the removal of one vessel from the Seattle-Bremerton route, as directed by the order. With the addition of $213,603.74 as working capital, the department then determined the rate base to be in the sum of $4,694,425.51.

(3) Allowing a ten per cent increase in excess of the 7040 rates, the department calculated that appellant's future annual intrastate revenues would be $4,664,486.28.

(4) The department found that the total future intrastate operating expenses of the company, before deduction of Federal income tax, would be $4,206,839.60 annually, which amount included $2,640,004.12 for direct operating expenses, maintenance, and insurance for the vessels. Deducting the total operating expenses from the estimated revenues, the department then found that appellant would have an operating income, before income taxes, of $457,646.68, and, after deduction of $173,905.73 for income taxes on intrastate business, a net operating income of $283,740.95. In arriving at these estimates, the department eliminated all expenses for the Seattle-Victoria route, and took into consideration the removal of one vessel from the Bremerton route, as ordered. It also eliminated all expenses for the retired vessels, and future losses which might be suffered by the Bremerton Transit Lines, operated in connection with ferries on the Bremerton route.

As to the future wage expenses, an amount of $300,000 was allowed, concerning which the following is stated:

"The department has received and reviewed the award of the labor arbiter wherein rates of pay, hours of work and conditions of employment have been determined for the future. The department has also taken into consideration the statement in Exhibit 19 showing the estimated cost of future wages as $286,293.00. According to the testimony of Captain Peabody this took into consideration present wage rates applied retroactively to January 1, 1947 and we see no reason why the award handed down will increase this

figure. We have also considered the conflicting statements of Captain Peabody and Captain Fox that on the one hand there was still a severe shortage of labor and on the other hand that labor was now plentiful and that there would be no more need for excessive overtime pay costs. Obviously, such statements and conclusions are imponderable, but after considering fully all of the evidence and all of the testimony we believe that $300,000.00 is a reasonable estimate of the effect of the decision handed down by the federal wage arbiter and find that this amount should be added to the expenses shown above for future operating costs."

Appellant and Northwest Greyhound Lines, Inc., brought the order of the department before the superior court for Thurston county for review. The court superseded the order and stayed its enforcement, pending adjudication of the proceeding before the court. The petitions for review were consolidated, and, after a hearing, the superior court, January 28, 1948, filed its memorandum opinion, which reads, in part, as follows:

"I believe the Department in determining the rate base in this case has followed a correct and lawful procedure and that part of its Order will be affirmed.

"The company alleges error of the Department in determining future annual revenues and also in determining gross annual operating expense, and also in determining future annual net operating income.

"These three allegations of error may be considered together. The very nature of the case requires that the facts and figures produced by both the company and the Department are estimates. . . . Unless the record disclosed substantial error or miscalculations on the part of the Department based upon the information furnished by its engineers, the Court is powerless to interfere. The findings of fact of the Department are prima facie correct. Remington's Revised Statutes, 10449.

"I find nothing in the record which would warrant holding that the calculations and conclusions made by the Department are not just, fair and reasonable with one exception, which will be hereinafter noted."

The order of the superior court, superseding the departmental order *pendente lite,* directed appellant, from and after August 3, 1947, to issue to its patrons refund receipts,

in accordance with the order of the department, the supersedeas to become effective upon the filing, by appellant, of a bond in the amount of fifty thousand dollars, protecting all persons interested from damage which might be caused by the postponement of the enforcement of the departmental order.

The superior court, February 18, 1948, entered its formal findings of fact and conclusions of law, which read, in part, as follows:

"(1) That said Findings of Fact, Opinion and Order of said defendant Director were made after full and complete investigation, followed a correct and lawful procedure, are just, fair and reasonable, and are correct with the exception only of that portion of the Order designated as paragraph 9 set forth at page 47, . . .

"(4) That in so far as rates in excess of lawful rates have been paid since the inception of this proceeding, in fairness and equity, such excess should be repaid.

"From the foregoing the Court concludes:

"(1) That said Findings of Fact, Opinion and Order of the defendant Director, with the exception only of said paragraph 9, should be affirmed. . . .

"(3) That in so far as it shall finally be determined that the rates in effect since February 15, 1947, and continued in effect pursuant to the Order of Supersedeas of this Court are in excess of lawful rates, refunds of the excess should be paid.

"(4) That this Court should retain jurisdiction of this cause for the purpose of enforcing the provisions of said Order of Supersedeas relating to refunds, and such liability, if any, as shall arise against the Supersedeas Bond filed herein."

On the same day, the court rendered its judgment, the pertinent portion of which reads as follows:

"(1) That said Findings of Fact, Opinion and Order of said defendant Director, with the exception only of that portion of the order designated as paragraph 9 set forth at page 47, reading as follows:

"'9. IT IS FURTHER ORDERED That where through interline tickets are sold in connection with a connecting motor bus operation for rides partly by ferry and partly by motor bus, the revenue accruing to the Puget Sound Navigation Company shall be equal to that under its local fares be-

tween the points where the service of transportation by ferry is rendered.'

be and the same is hereby affirmed. . . .

"(3) That in so far as it shall finally be determined that the rates in effect since February 15, 1947 and continued in effect pursuant to the Order of Supersedeas of this Court are in excess of lawful rates, refunds of such excess shall be paid by said plaintiff Company.

"(4) That this Court hereby retains jurisdiction of this cause for the purpose of enforcing the provisions of said Order of Supersedeas relating to refunds and such liability, if any, as shall arise against the Supersedeas Bond filed herein.

"(5) That this cause be and the same is hereby remanded to the defendant Department for further proceedings in conformity herewith."

It appears from the statement of facts in the case at bar, showing proceedings before the superior court, that, February 13, 1948, appellant gave notice to the department and to the public that, February 29, 1948, it would suspend its intrastate common carrier operations, which had theretofore been conducted pursuant to a certificate of public convenience and necessity.

After the giving by appellant of the notice above referred to, the department, appearing by the attorney general, filed before the superior court for Thurston county its petition entitled "THE STATE OF WASHINGTON, on the Relation of the Department of Transportation, and Paul Revelle, Director thereof, Relators, vs. PUGET SOUND NAVIGATION COMPANY, a Nevada Corporation, Respondent," and bearing superior court file No. 23365.

The relators alleged that the threatened abandonment of operations and suspension of service by appellant, a public service corporation, would be contrary to law, without excuse or justification, and in violation of the rules and regulations of the department of transportation governing and controlling appellant's operations; that, in so far as it might have been or be entitled to relief, appellant had not availed itself of the several remedies by law available to it, and that, unless enjoined and restrained from discontinuing its service, and required to continue operation of its

transportation system as a common carrier, appellant's patrons and the public generally would be without transportation service and would suffer irreparable damage.

The relators further alleged that an emergency existed, and asked that appellant be permanently enjoined from discontinuing its operations and business, and commanded to continue to operate its transportation system as a public common carrier between ports on Puget Sound, until further order of the court.

After a hearing, and the introduction of evidence, the superior court filed its memorandum opinion denying the petition of the relators, which opinion contains the following:

"It is conceded that a public service corporation may not abandon its operations without a proper showing or just cause. It is also conceded that such a company cannot be compelled to continue to operate at a great loss. The evidence in this case shows that the Respondent cannot operate except at a loss and cannot operate at all by reason of its financial difficulties."

The record before this court does not disclose any further proceedings had in connection with the question presented to the superior court by the relators.

March 3, 1948, appellant filed its motion to vacate the judgment which had previously been entered and for a rehearing. This motion was based upon the affidavit of Captain Alex M. Peabody, referring to the proceedings which had been had before the department and the superior court, and containing the following statement:

"That said order of the Department was based on findings and conclusions by the Department of estimated future revenue at said lowered rates and estimated expense and resulting earnings which the Department found would return to the company a net earning of $457,646.68 annually. That for the year 1947, commencing February 15, 1947, the company collected the rates established on said date and has continued to collect such rates to and including February 29, 1948, subject to refund as in said order provided, at which time the company discontinued its operations covered by said order. That instead of the company earning the estimated amount as provided by said order of the De-

partment, the company for the year 1947 earned the amount of $426,544.31, against which potential refunds in the amount of $642,041.35 have accrued, leaving a deficit for the year 1947 in the amount of $215,497.04, and a proportionally similar deficit has resulted for the period January 1, 1948 to and including February 29, 1948. . . ."

This motion was denied by the superior court, whereupon appellant appealed to this court from the adverse judgment entered as above set forth, and from the order denying its motion to vacate the judgment and for a rehearing, filing an appropriate bond in support of its appeal.

In this opinion, we shall refer to respondent department of transportation of Washington as though it were the sole respondent.

Appellant presents the following assignment of error:

"(1) The Superior Court erred in finding and concluding that the Findings of Fact, Opinion and Order of the Department were made after full and complete investigation, followed a correct and lawful procedure, are just, fair and reasonable, and are correct, with the exception only of paragraph 9 set forth at page 47 thereof, and in affirming the same.

"(2) The Superior Court erred in finding that in so far as rates in excess of lawful rates have been paid since the inception of this proceeding, in fairness and equity, such excess should be repaid.

"(3) The Superior Court erred in concluding that in so far as it shall finally be determined that the rates in effect since February 15, 1947, and continued in effect pursuant to the Order of Supersedeas are in excess of lawful rates, refunds of such excess should be paid, and in decreeing that the same shall be paid by appellant, Puget Sound Navigation Company.

"(4) The Superior Court erred in concluding that it should retain jurisdiction of this cause for the purpose of enforcing the provisions of the Order of Supersedeas relating to refunds, and such liability, if any, as shall arise against the Supersedeas Bond, and in decreeing that such jurisdiction is retained.

"(5) The Superior Court erred in affirming the Order of the Department requiring the Company to make refunds to holders of 'refund receipts.'

"(6) The Superior Court erred in failing to exercise its independent judgment in the determination of questions of both fact and law on the issue of confiscation as required by the due process clauses of both the Federal and State constitutions.

"(7) The Superior Court erred in failing to determine that the findings of the Department of future annual revenue, operating expenses, and net operating income were erroneous and furnish no basis for a finding that the prescribed rates would be reasonable for any period, thus permitting confiscation of the property of appellant Puget Sound Navigation Company in violation of the due process clauses of both the Federal and State constitutions.

"(8) The Superior Court erred in failing to determine that the Order of the Department should be reversed because the Department failed to grant the Company a fair hearing as required by statute, and in violation of the due process clauses of both the Federal and State constitutions.

"(9) The Superior Court erred in failing to determine that the Order of the Department in so far as it directs refunds is not supported by the evidence or any findings.

"(10) The Superior Court erred in failing to determine that the Order of the Department in so far as it directs refunds is beyond the power or authority of the Department in view of the provisions of Rem. Rev. Stat. §§ 10433 *et seq.*

"(11) The Superior Court erred in failing to grant appellant's Motion to Vacate Judgment and for a Rehearing, thus depriving appellant Puget Sound Navigation Company of its property without due process of law, in violation of the due process clauses of both the Federal and State constitutions."

It is appellant's position that, because of the abandonment of its operations, as above stated, and the fact that it surrendered its certificate of public convenience and necessity, all questions concerning the validity of the order of respondent department, in so far as the order prescribed rates from and after February 29, 1948, have become moot, and that the only issue presented upon this appeal is the validity of that portion of the order directing refunds to appellant's patrons for transportation after February 15, 1947, as required by respondent's order and the orders of the superior court.

Respondent argues that not only have questions concerning the matters above referred to become moot, but that appellant, as respondent contends, not having exhausted its statutory remedies for a review of the order of the department in all particulars, and having discontinued its ferry services, should be estopped from further prosecuting this appeal. Respondent states this question as follows:

"Did the Appellant by abandoning its service before appeal [from the order and judgment of the superior court] cease to be a public service company and become no longer entitled to appeal under the provisions of Rem. Rev. Stat. 10430?"

Appellant contends that the record contains nothing which indicates that its service was discontinued prior to the taking of its appeal to this court.

■ When steps were taken to bring the matter of appellant's operations before respondent department, and when respondent entered its order after the close of the hearing, appellant was a public service company, subject to the jurisdiction of the department. As such, appellant had the right to bring the department's order before the superior court for review (Rem. Rev. Stat. (Sup.), § 10428). When the superior court entered its judgment, appellant was still a public service company, and had the right, pursuant to Rem. Rev. Stat., § 10430, to appeal to this court from the judgment entered.

■ Assuming, for the sake of argument, that, prior to initiating its appeal to this court, appellant had ceased operations and surrendered its certificate, and had lost its status as a public service company, nevertheless appellant still had the right to appeal to this court from certain portions of the judgment. Appellant never recognized, directly or by implication, the validity of the judgment of the superior court. Appellant merely took the position that, under the order of the department, which it always has contended violated its legal rights, it was impossible for appellant to longer continue to render service to the public by operating its transportation system.

As above stated, prior to the rendition by the superior court of its final judgment, appellant gave notice of its intention to abandon its intrastate operations and to surrender its certificate of public convenience and necessity, February 29, 1948. It was after the giving of this notice that the respondent director of transportation, by the attorney general of the state, sought to enjoin appellant from discontinuing its transportation business, in so far as its intrastate operations were concerned. It does not appear that, in resisting these proceedings, appellant did anything inconsistent with its right to appeal from the judgment, or by which appellant voluntarily acquiesced in or impliedly recognized the validity of the judgment, which, in the meantime, had been entered by the superior court. On the contrary, appellant has always contended that the judgment was erroneous, as depriving appellant of its property without due process of law. We have quoted above from the trial court's memorandum opinion in connection with this phase of the litigation.

We hold that appellant is not estopped to appeal from the judgment, and that questions before us on the appeal have not become moot. We also hold that no waiver or estoppel operates against appellant. *State ex rel. Public Service Comm. v. Skagit River Tel. & Tel. Co.*, 85 Wash. 29, 147 Pac. 885, 151 Pac. 1122.

Appellant contends that the superior court erred in not exercising its own independent judgment upon the evidence introduced, in ruling against appellant's contention that its property, by the departmental order, was taken without due process of law, and in denying appellant's motion to vacate the judgment which the superior court had entered, and for a rehearing for the purpose of allowing appellant to show its actual cost experience during the refund period, by the introduction of further evidence not contained in the record made before the department.

If these rulings of the superior court were erroneous, the judgment appealed from should be reversed, and the cause remanded. For reasons which will appear later in this opinion, these questions need not be further considered.

Appellant contends that, in view of Laws of 1943, chapter 258, §§ 1, 2, p. 794 (Rem. Supp. 1943, §§ 10433, 10433-2), and Rem. Rev. Stat. (Sup.), § 10433-1, both the department and the superior court erred in directing that refunds to its patrons be made by appellant, even though it appeared that the rates charged its patrons by appellant, after February 15, 1947, were excessive, appellant contending that the statute provides an exclusive procedure covering the matter of reparations.

On the other hand, respondent department contends that, by its terms, the statute applies only to complaints by individuals and does not cover situations such as are here presented, and that the refunds were ordered in accordance with the provisions of the temporary tariff, pursuant to which the rates charged by appellant were collected.

▮ Respondent department is a creature of statute, possessing such powers and authority as have been vested in it by the legislature. *North Bend Stage Lines v. Schaaf,* 199 Wash. 621, 92 P. (2d) 702; *State ex rel. Pacific Tel. & Tel. Co. v. Department of Public Service,* 19 Wn. (2d) 200, 142 P. (2d) 498; *State ex rel. Public Utility Dist. No. 1 of Okanogan County v. Department of Public Service,* 21 Wn. (2d) 201, 150 P. (2d) 709.

The following statutory provisions are here pertinent:

Laws of 1943, chapter 258, § 1, p. 794, Rem. Supp. 1943, § 10433: "When complaint has been made to the Department of Public Service concerning the reasonableness of any rate, fare, toll, rental or charge for any service performed by any public service company, and the same has been investigated by the Department, and the Department has determined that the public service company has charged an excessive or exorbitant amount for such service, and the Department has determined that any party complainant is entitled to an award of damages, the Department shall order that the public service company pay to the complainant the excess amount found to have been charged, whether such excess amount was charged and collected before or after the filing of said complaint, with interest from the date of the collection of said excess amount."

Laws of 1943, chapter 258, § 3, p. 794, Rem. Supp. 1943, § 10433-2: "If the public service company does not comply

with the order of the Department for the payment of the overcharge within the time limited in such order, suit may be instituted in any Superior Court where service may be had upon the said company to recover the amount of the overcharge with interest. . . . If the complainant shall prevail in such action, the Superior Court shall enter judgment for the amount of the overcharge with interest and shall allow complainant a reasonable attorney's fee, . . .

"The procedure provided in this section is exclusive, and neither the Supreme Court nor any Superior Court shall have jurisdiction save in the manner hereinbefore provided."

These sections of the statute have been considered by this court in connection with actions brought by patrons of common carriers, operating pursuant to the laws of this state.

It does not appear from the record that any complaint was presented to the department by patrons of appellant, by which recovery of overcharges was sought, nor are we advised that any action was instituted before the superior court for the recovery of any such alleged overcharges.

In the case of *Hewitt Logging Co. v. Northern Pac. R. Co.*, 97 Wash. 597, 166 Pac. 1153, 3 A. L. R. 198, this court said:

"We find that the remedy afforded by the statute, while not in the strict sense of the term exclusive, is to the extent that it requires a submission of all controverted questions arising out of freight rates and freight charges mandatory, and that one aggrieved by an overcharge must first submit his petition to the public service commission within two years after his cause of action has accrued, as a condition precedent to the right to maintain an action, which is in form a common law action, modified only in so far as the statute touches the measure of recovery and the time within which the action may be brought."

In the case of *Belcher v. Tacoma Eastern R. Co.*, 99 Wash. 34, 168 Pac. 782, it appeared that the defendant railroad company had invoked the aid of the Washington public service commission in canceling certain switching charges, which, apparently, were unjust and discriminatory. The company's petition had been granted by the commission, subject to the condition that the company " 'within ninety

days from the date of service of this order, refund to all claimants as their interests may appear' " certain sums collected or sought to be collected by way of switching charges. The plaintiff (appellant before this court), who had shipped logs over the railroad, without first filing a complaint with the public service commission asking for the recovery of alleged overcharges, brought suit before the superior court for the recovery of the excessive exaction. The superior court dismissed the action and, on an appeal by the plaintiff, this court affirmed the judgment, holding that the application of the respondent carrier to the public service commission, in view of certain statements made by the carrier in its petition, amounted to an agreement to refund all of the overcharges, but that, nevertheless, the action instituted by the plaintiff lacked merit because:

"The order entered by the commission in this case does not designate the individual shippers from whom the discriminatory exactions had been collected, nor does it ascertain or fix the amount due each. Section 91 of the act clearly contemplates that the commission must determine the amount of the overcharge in the first instance and its order constitutes the basis of the shipper's right of action in the superior court, in the event the public service company fails or refuses to comply with the order as entered by the commission. Under the holding in *Hewitt Logging Co. v. Northern Pac. R. Co., supra,* the appellant must first submit the claims to the public service commission and have the amount due determined by it and if, when this is done, the respondent refuses to comply with the order, institute an action in the superior court to enforce the collection of the amount found due."

See, also, *State ex rel. Tacoma Eastern R. Co. v. Public Service Comm.,* 102 Wash. 589, 173 Pac. 626; *State ex rel. Tacoma Eastern R. Co. v. Public Service Comm.,* 112 Wash. 629, 192 Pac. 1079; *Belcher v. Tacoma Eastern R. Co.,* 117 Wash. 512, 201 Pac. 750; *Tacoma Eastern R. Co. v. Public Service Comm.,* 117 Wash. 609, 202 Pac. 1, and *Tacoma Grain Co. v. Northern Pac. R. Co.,* 123 Wash. 664, 213 Pac. 22.

In *Northern Pac. R. Co. v. Sauk River Lbr. Co.*, 82 F. (2d) 519, the circuit court of appeals for the ninth circuit, reversing a judgment of the district court for the western district of Washington, northern division, held that a determination by the department of public works, fixing the amount due a shipper for overcharges on the shipment of freight, was a condition precedent to the institution of an action by the shipper against the carrier.

In the case at bar, the order of respondent department, directing the payment of refunds by appellant, was entered in a proceeding instituted by the department, *inter alia*, for the purpose of establishing rates to be charged by appellant for the transportation of passengers, motor vehicles, and freight. The proceeding was not initiated because of complaints by patrons, in accordance with the provisions of Rem. Supp. 1943, § 10433, *supra*, but was instituted by the department upon its own motion, and on the relation of certain groups and organizations, who had filed complaints against then existing rates charged by appellant and against proposed increases in those rates.

In the case of *Pacific Coast Elevator Co. v. Department of Public Works*, 130 Wash. 620, 228 Pac. 1022, it appeared that the department, on its own motion, complained of charges by public warehouse operators for the handling and storage of grain and hay, alleging that the existing charges were, in many instances, excessive and discriminatory. After a hearing before the department, an order was entered, fixing rates to be charged in the future by the owners and operators of warehouses within a certain territory. In addition, the order contained the following:

" 'The various operators will be expected to refund any amounts collected in relation to the 1922 crop in excess of the amounts prescribed in this order. All such payments, however, should be refunded through the department of public works in conformity with Chapter 110 of the Laws of 1921. Any such refunds shall be paid to the Department of Public Works to be disbursed by it in conformity with such statute.' "

The plaintiff, one of the warehouse operators, caused the order to be reviewed by the superior court for Thurston county, and, from an adverse judgment rendered by that court, appealed to this court. From the opinion, it does not appear that it was contended that the department had no authority to order refunds paid, as an incident to a proceeding for the determination of rates. However, the appellant did contend that, in so far as the order related to past charges, it was retroactive and void. Concerning this question, the court said:

"But this provision [of a statute cited], we think, is applicable only to the special case where recovery is sought for an overcharge made in a specific transaction, and is not applicable to a proceeding brought primarily to establish a future rate. That there is an essential distinction between the two proceedings is at once apparent. This distinction was pointed out by the supreme court of the United States in *Baer Bros. Merc. Co. v. Denver & R. G. R. Co.*, 233 U. S. 479, wherein the court said:

" 'That the two subjects of Reparation and Rates may be dealt with in one order is undoubtedly true. *Texas & Pac. Ry. v. Abilene*, 204 U. S. 426, 446. *Robinson v. Balt. & Ohio R. R.*, 222 U. S. 506, 509. But awarding reparation for the past and fixing rates for the future involve the determination of matters essentially different. One is in its nature private and the other public. One is made by the Commission in its *quasi*-judicial capacity to measure past injuries sustained by a private shipper; the other, in its *quasi*-legislative capacity, to prevent future injury to the public.' "

This court affirmed the judgment of the lower court, holding that the order of the department referred only to charges paid after the department, by filing its complaint, had acquired jurisdiction to determine the rates to be charged. The opinion concludes:

"The wrong sought to be corrected was then existent. The powers of the department in such matters are legislative rather than judicial, and its powers were as potent from the time it acquired jurisdiction as they were at any subsequent time. We hold, therefore, that the order was not in this respect in excess of power."

Assuming that respondent department was not, by Rem. Supp. 1943, §§ 10433, 10433-2, *supra,* empowered to direct that, in the future, refunds be paid to certain persons, it does not necessarily follow that the department did not have authority to direct refunds as provided in the order which it entered.

In *Northern Pac. R. Co. v. Baker,* 3 F. Supp. 1, the court said:

"Where a power is given and no express provision is made as to the manner of its exercise, that which is lawful and necessary to the effective execution of the power is implied, *State ex rel. R. R. Com. v. Great Northern R. Co.,* 68 Wash. 257-262, 123 P. 8, 11, . . ."

In *State ex rel. R. Comm. v. Great Northern R. Co.,* 68 Wash. 257, 123 Pac. 8, this court said:

"The legislature, acting within its constitutional powers, has, by statute, created the railroad commission and entrusted to its jurisdiction the broad and complex field covered by the duties of common carriers in their relation to the public as such. A jurisdiction so vast is of necessity covered in general terms. The dominant purpose of the act is remedial. There is, therefore, conferred by necessary implication every power proper and necessary to the exercise of the powers and duties expressly given and imposed.

" 'While in the abstract the power to prescribe rules and regulations for common carriers appertains to the legislative department, it is settled that within proper limits such power may be exercised through administrative officers and boards, and that in general such officers and boards have authority to do anything proper and necessary for the complete lawful exercise of the duties imposed upon them.

" 'Wherever a power is given by statute, everything lawful and necessary to the effectual execution of the power is given by implication of law. [Citing cases.] . . .' *State v. Atlantic Coast Line R. Co.,* 56 Fla. 617, 47 South. 969."

In the later case of *State ex rel. Public Utility Dist. No. 1 of Okanogan County v. Department of Public Service,* 21 Wn. (2d) 201, 150 P. (2d) 709, we said:

"It is well settled in this state, as elsewhere, that a public service commission, such as the department of public service in this state, is an administrative agency created by statute and as such has no inherent powers, but only such as have

been expressly granted to it by the legislature or have, by implication, been conferred upon it as necessarily incident to the exercise of those powers expressly granted. [Citing cases and authorities.]"

In 51 C. J. 48, § 91, we read the following text:

"A public utility commission having power to regulate rates may, when it deems it justified, fix a temporary rate to be charged by a utility pending a valuation of the utility's property and the determination of a reasonable permanent rate."

See, also, 43 Am. Jur. 707, § 202.

■ In the case at bar, respondent department allowed appellant to file temporary rates. The authority of the department to control such rates is not questioned, and the filing of this tariff was allowed for the benefit of appellant. Respondent department was by Rem. Supp. 1941, § 10424, *supra,* vested with power to suspend the temporary rates and prevent their becoming effective, so long as its order stood unamended and unreversed. However, the department, in the exercise of its discretion, allowed the temporary rates, which were higher than those previously in effect, to be charged. The power vested in the department to refuse to allow the new tariff filed by appellant to become effective, necessarily implies the power to allow the tariff to become immediately effective, pursuant to reasonable conditions or limitations.

The situation presented is comparable to that of an application for a certificate of public convenience and necessity filed with the department. When such a certificate is requested, the department may deny the application, grant it, or grant it subject to certain reasonable conditions. Rem. Rev. Stat., § 10361-1; 4 McQuillin, Municipal Corporations (2d ed.) 942, § 1768; 51 C. J. 52, § 95; 43 Am. Jur. 581, § 16.

■ Respondent department, of course, was in duty bound to protect the traveling public from overcharges by any common carrier, and, at the same time, to see that the tariffs in force were sufficient to insure that public service corporations would receive fair and adequate returns for the services rendered. The rates which respondent allowed

appellant to charge temporarily, were subject to examination from the standpoint of fairness to both appellant and the public, and, during the experimental period, it was within the power of respondent department to allow appellant to charge according to its current tariff, upon the condition that refunds to patrons would be made if it should be determined that the temporary rates were unreasonably high. Appellant accepted the conditional allowance of its tariffs and acted thereon by collecting the temporary rates. Whether or not the department was correct in ordering that refunds to the patrons be made, presents a different question.

If respondent had lawful authority to impose conditions, pursuant to which refunds of charges found to be excessive should be made, the department was also vested with authority to make a final determination fixing reasonable rates, after due hearing and investigation, and to direct payment of refunds to patrons, if it were satisfied that the temporary rates charged had been excessive.

Matters concerning the method which should be followed by respondent in enforcing such an order in favor of particular patrons of appellant's transportation system, and how the order should be enforced, are questions which, in view of the determination which we reach in the case at bar, need not now be considered.

We hold that the respondent department is, pursuant to law, vested with authority, in proper cases, to direct the payment of refunds by an order entered after a hearing. As to whether refunds should have been directed to be paid, and, if so, in what amounts, we express no opinion.

In fixing fair and reasonable rates for the services rendered by appellant, respondent department was required to consider complicated questions which were difficult of solution. At the time the department was conducting the hearing which it had instituted, disputes between appellant and its employees, concerning wages and hours of labor, were being heard by the Federal arbitrator. It was known by all parties concerned that the result of this arbitration

would be an important factor in connection with the determination of fair and reasonable rates to be charged by appellant.

It was, then, as a practical proposition, not only convenient but necessary when, at the close of the departmental hearing, the representatives of the department and those representing appellant agreed that the department would not fix and declare the rates which should be charged by appellant until the Federal labor arbitrator had announced his award. Until that definite announcement was released, estimates as to the wages which appellant would be required to pay would have been mere guesswork, or "nebulous," as was stated by Mr. Krieger, respondent's chief accountant. It was necessary that the arbitrator's award be first accomplished and released, and then considered by the department as a part of the record made before it, upon which the departmental order would be based.

As above stated, the award, when it was released, presented certain matters concerning the future amount of appellant's payrolls, which questions certainly required study and consideration before just and fair rates could be fixed by respondent. In fixing rates at the termination of such a hearing as it was conducting, respondent could not take into consideration matters outside of its record, as a valid order must be based upon the record, and upon findings and conclusions lawfully made by the department from that record.

In *State ex rel. Country Club of Seattle v. Department of Public Service*, 198 Wash. 37, 86 P. (2d) 1104, this court, considering a question somewhat similar to that here presented, said:

"We come now to the most serious question raised on the appeal. The appellants contend that the findings, opinion, and order are, to a large extent, based upon (1) matters not shown by the evidence; and (2) occurrences which took place after the conclusion of the hearings. They call attention to the fact that our statutes provide for a complete transcript of all testimony (Rem. Rev. Stat., § 10423 [P. C. § 5608]), and that provision is made for review on this

record alone, both by the superior court (§ 10428 [P. C. § 5613]), and by this court (§ 10430 [P. C. § 5615]). . . ."

The opinion then refers to several authorities and continues:

"The point involved is, perhaps, as concisely stated in the case of *Atchison, Topeka & Santa Fe R. Co. v. Commerce Commission*, 335 Ill. 624, 167 N. E. 831, as in any other:

" 'The commissioners cannot act on their own information. Their findings must be based on evidence presented in the case, with an opportunity to all parties to know of the evidence to be submitted or considered, to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal, and nothing can be treated as evidence which is not introduced as such.'

"It is said in the cases cited that the regulatory body must base its findings on evidence before it, and that nothing can be treated as evidence which has not been introduced as such, and in one of the cases, that a violation of these principles constitutes 'a denial of due process,' and in another, is 'inconsistent with rational justice.' "

See, also, *State ex rel. Pacific Tel. & Tel. Co. v. Department of Public Service*, 19 Wn. (2d) 200, 142 P. (2d) 498.

In *State ex rel. York v. Board of County Commissioners*, 28 Wn. (2d) 891, 184 P. (2d) 577; this court, reversing a judgment of the superior court dismissing an action in mandamus, and thereby upholding the granting of a franchise by the board of county commissioners, said:

"We do not question the good faith of the board, nor do we presume to pass upon the wisdom of its determination. We do, however, assert our opinion, from a fair consideration of the evidence, that the board acted from a misunderstanding of the law, also that it acted precipitantly, and to that extent arbitrarily, respecting a matter which affected substantial interests of numerous persons, including the public utility then serving the county. The application was not urgent and deserved mature deliberation. In these circumstances, there was in truth no determination that the requested franchise was for the public interest, as required by statute."

In *Interstate Commerce Comm. v. Louisville & Nashville R. Co.*, 227 U. S. 88, 57 L. Ed. 431, 33 S. Ct. 185, the supreme

court, referring to a hearing which resulted in the fixing of railroad rates by the commission, said:

"But the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended. In such cases the Commissioners cannot act upon their own information as could jurors in primitive days. All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense. In no other way can it test the sufficiency of the facts to support the finding; for otherwise, even though it appeared that the order was without evidence, the manifest deficiency could always be explained on the theory that the Commission had before it extraneous, unknown but presumptively sufficient information to support the finding. *United States v. Baltimore & Ohio S. W. R. R.*, 226 U. S. 14."

In *Ohio Bell Tel. Co. v. Public Utilities Comm. of Ohio*, 301 U. S. 292, 81 L. Ed. 1093, 57 S. Ct. 724, the supreme court of the United States said:

"When price lists or trade journals or even government reports are put in evidence upon a trial, the party against whom they are offered may see the evidence or hear it and parry its effect. . . .

"Regulatory commissions have been invested with broad powers within the sphere of duty assigned to them by law. Even in quasi-judicial proceedings their informed and expert judgment exacts and receives a proper deference from courts when it has been reached with due submission to constitutional restraints. *West Ohio Gas Co. v. Public Utilities Comm'n* (No. 1), *supra* [294 U. S. 63], p. 70; *West Ohio Gas Co. v. Public Utilities Comm'n* (No. 2), 294 U. S. 79; *Los Angeles Gas & Electric Corp. v. Railroad Commission*, 289 U. S. 287, 304. Indeed, much that they do within the realm of administrative discretion is exempt from supervision if those restraints have been obeyed. All the more insistent is the need, when power has been bestowed so freely, that the 'inexorable safeguard' (*St. Joseph Stock Yards Co. v. United States*, 298 U. S. 38, 73) of a fair and open hearing be maintained in its integrity. *Morgan v. United States*, 298 U. S. 468, 480, 481; *Interstate Commerce*

*Comm'n v. Louisville & N. R. Co., supra* [227 U. S. 88]. The right to such a hearing is one of 'the rudiments of fair play' (*Chicago, M. & St. P. Ry. Co. v. Polt,* 232 U. S. 165, 168) assured to every litigant by the Fourteenth Amendment as a minimal requirement. *West Ohio Gas Co. v. Public Utilities Comm'n* (No. 1), (No. 2), *supra; Brinkerhoff-Faris Co. v. Hill,* 281 U. S. 673, 682. Cf. *Norwegian Nitrogen Co. v. United States, supra* [288 U. S. 294]. There can be no compromise on the footing of convenience or expediency, or because of a natural desire to be rid of harassing delay, when that minimal requirement has been neglected or ignored."

See, also, *State ex rel. Wright v. Morrison,* 80 Ohio App. 135, 75 N. E. (2d) 106.

In 12 Am. Jur. 303, § 608, the rule is stated as follows:

"There is no hearing when the party does not know what evidence is offered or considered and is not given an opportunity to test, explain, or refute."

See, also, 42 Am. Jur. 479-483, §§ 137, 138.

When the department ceased to hear evidence and argument, the hearing was kept open in order that the award of the Federal arbitrator concerning wages and working conditions for appellant's employees might be considered when filed. It was recognized by all concerned that this award was a very material element to be considered in determining fair, just, and reasonable rates to be charged by appellant for its services to the public.

As above stated, the arbitrator, in his award, called attention to the fact that the conclusion which he reached would result in a substantial increase in the amount of wages to be paid by appellant in operating its transportation system.

Had there been no understanding between the parties that the arbitrator's award could be considered, appellant, nevertheless, would have been entitled, under the due process principle, to introduce evidence regarding the increase in its operation costs which it would be required to pay pursuant to the award, and other pertinent matters.

The quotations from the departmental record, above set forth, under the dates June 11 and 18, 1947, show, beyond question, that it was understood and agreed by all concerned, including director Revelle and the department's counsel, that Mr. Seering would be requested "to make available a copy of his report after he hands down his award." During the colloquy June 11th, Mr. O'Brien, counsel for the unions, said that it was his "agreement," in substance, that Mr. Seering's award should be handed down prior to the determination by the department, whereupon Mr. Lordan, counsel for the department, stated: "That is our understanding." Examiner Starin then said:

"The understanding is then that subsequent to the arbitrator's award, statement will be made by Captain Fox and such statements as the company may wish to enter and that those both will be presented to the Department and could be considered by the Department as part of the record in this proceeding."

This latter statement by Mr. Starin appears to have been made in the presence of director Revelle.

At the close of the hearing, June 18th, there was a lengthy discussion, quoted above, during the course of which the following occurred:

"MR. LORDAN: We likewise have an understanding upon the record . . . that when the arbitration award is completed and made and filed with the Department, that there was to be a statement filed or an exhibit which was to show on behalf of both Captain Fox and Captain Peabody what the effect of that award was in dollars of operating expense upon the Puget Sound Navigation Company for the year or for any period, any stated period, after the award was made. Is that correct, Captain Peabody? MR. PEABODY: That is right. MR. LORDAN: So that there will have to be a reservation of both documents, and on behalf of the Department's staff, I will undertake to see that as far as that exhibit is concerned, or those exhibits which are not distributed to all parties of counsel, that the staff will undertake that responsibility and duty. . . . EXAMINER STARIN: With reference to Exhibit No. 44 and Exhibit No. 45, those should be supplied to the Department immediately and with reference to Exhibit No. 43, which is to be the

report of the Labor Arbitrator and also the statement by the company concerning that, and statement by Captain Fox concerning that, the Department will rule that that must be filed with the Department within a reasonable time to receive consideration."

From the colloquy, quoted above, held June 18th among the director, examiner Starin, and counsel for the various interested parties, including the department, it appears, beyond question, that it was contemplated that Mr. Seering's award would be presented and considered, together with statements by Captain Peabody, on behalf of appellant, and Captain Fox, on behalf of the unions.

█ Respondent department gives no satisfactory explanation of its disregard of the record made before it, as shown by the release of its own final order on the same day that the Federal arbitrator filed his award. This action of the department clearly resulted in a denial to appellant of due process of law, as appellant was deprived of all opportunity to introduce before the department evidence, which it claims was available, concerning the effect of the increase in its operating expenses that would necessarily follow from the considerably greater amount of wages it would be required to pay.

In respondent's brief, it is stated "that the Department had undoubtedly received and reviewed the Arbitrator's Award some time prior to the date of its release to the public on July 3, 1947."

The record nowhere discloses that the department did receive and consider the award prior to July 3rd, but, even had it done so, appellant was entitled to introduce evidence before the department concerning the award and to show contentions as to its effect upon appellant's operating costs. Respondent does not suggest that appellant was advised regarding the arbitrator's award prior to its release, and, if the department did receive an advance copy of the award, it should have been openly considered by the department, its possible effects discussed, and evidence concerning the same introduced, if desired, prior to the rendition of any final departmental order.

The department included in its findings the following:

"  .  .  . after considering fully all of the evidence and all of the testimony we believe that $300,000.00 is a reasonable estimate of the effect of the decision handed down by the federal wage arbiter  .  .  . "

It should not be assumed that respondent department had the benefit of considering an advance copy of the award, which was withheld from appellant. The departmental order contains nothing indicating the facts upon which the department based its "estimate." Mr. Seering, the arbitrator, was the person best qualified to appraise the effects of his award upon appellant's payrolls, and clearly stated his opinion, as above set forth.

The last-quoted portion of the department's findings cannot be accepted as a finding based upon the record before the department, which is now before this court for consideration.

In *Manlowe Transfer & Distributing Co. v. Department of Public Service*, 18 Wn. (2d) 754, 140 P. (2d) 287, 155 A. L. R. 928, this court quoted with approval from *State ex rel. Model Water & Light Co. v. Department of Public Service*, 199 Wash. 24, 90 P. (2d) 243, the following:

" 'The findings of the department are to be given the same weight accorded to any impartial tribunal, and may not be overturned unless the clear weight of the evidence is against its conclusions, or unless it has mistaken the law applicable to the matter adjudicated, or, as sometimes expressed, unless the findings show evidence of arbitrariness and disregard of the material rights of the parties to the controversy.' "

We quote from the opinion in the *Manlowe* case:

"When it is remembered that, in many of these cases, the complaint is brought by the department, as it was in this case, and the department is, therefore, in effect, both the prosecutor and the finder of the facts, some substantial power of review as to facts must be left to the courts unless we are to abandon the fundamental safeguards of our jurisprudence."

In the case at bar, we do not undertake to review the evidence contained in the record regarding technical matters important in fixing rates to be charged by appellant, as no evidence was introduced concerning a very essential and pertinent issue of facts bearing upon that question.

In view of the conclusion which we reach concerning the decision to be rendered, it is not necessary to discuss the extensive estimates, contained in the record and in the briefs of the respective parties, pertaining to appellant's operating revenues, operating costs, and net income for the year 1947, as the actual experience of appellant during that period may be introduced before the department, if desired. The same is true in connection with the refunds to patrons, ordered by the department.

Several other important questions inhere in the record, such as the ruling of respondent department in connection with appellant's Seattle-Victoria route, the department's removal of one ferry from the Seattle-Bremerton route, the matter of anticipated losses in the operation of appellant's bus lines, the maintenance of stand-by vessels, and the method followed by the department in determining appellant's rate base. We do not consider these questions, in view of the fact that the proceeding must be remanded to the department for further consideration.

Questions which have ceased to be active controversies may be eliminated, when the matter again is brought before the department.

Upon the record before us, we hold that respondent department did not accord appellant a full and fair hearing before issuing the order before us for review.

The judgment of the superior court, affirming the "Findings of Fact, Opinion and Order" of the respondent director and of the department, is reversed, and the cause remanded to the superior court, with instructions to remand the proceeding to respondent department, directing that the department vacate its order of July 3, 1947, and reopen the proceeding for the taking of such additional competent evidence as may be necessary or pertinent to the questions to be determined.

To clear the record, the order of the superior court, dated March 5, 1948, denying appellant's motion for an order vacating the findings of fact, conclusions of law, and judgment of February 18, 1948, and granting a rehearing, is vacated and set aside.

STEINERT, ROBINSON, SIMPSON, and HILL, JJ., concur.

SCHWELLENBACH, J. (dissenting)—The record shows that the award of the arbitrator was dated July 3, 1947. The statement of Captain Peabody, arguing that there would be additional operating costs in the amount of $933,936.88, resulting from the award, was dated July 21, 1947. On the same day, July 21, 1947, appellant filed in the superior court its petition for review of the proceedings before the department, alleging, among other things, that the failure to consider Captain Peabody's statement was a denial of due process.

It should be borne in mind that no additional testimony was to be introduced following the award of the arbitrator, but merely that Captain Peabody's statement (which was to be an argument) would be considered. The testimony was all in. At the hearing Mr. Lordan stated:

"The evidence of the record has already closed as to basic testimony relative to hours worked and man hours and everything with respect to these boats. I take it that there would be no objection to them expressing their opinion as to what that additional award, if any, would amount to, but from this record and from the award itself, I think that computations could be made by the Department."

The cases cited in the majority opinion are not in point as to the issue under consideration. In those cases the commissioners went outside the record and based their decision as to the facts on such information thus obtained. Naturally, such procedure deprived the appellants of due process.

Here, the appellants received notice of the hearing; they were represented by counsel; they presented evidence and were permitted to cross-examine witnesses. Then, after the evidence was all in the department considered it and

rendered its decision, *based on the evidence alone.* There was no denial of due process.

The proper procedure for the review by the courts of an order of a rate-making body is set out by the supreme court in *St. Joseph Stock Yards Co. v. United States,* 298 U. S. 38, 80 L. Ed. 1033, 56 S. Ct. 720, speaking through Mr. Chief Justice Hughes:

"In view, however, of the discussion in the court's opinion, the preliminary question should be considered. The fixing of rates is a legislative act. In determining the scope of judicial review of that act, there is a distinction between action within the sphere of legislative authority and action which transcends the limits of legislative power. Exercising its rate-making authority, the legislature has a broad discretion. It may exercise that authority directly, or through the agency it creates or appoints to act for that purpose in accordance with appropriate standards. *The court does not sit as a board of revision to substitute its judgment for that of the legislature or its agents as to matters within the province of either. San Diego Land & Town Co. v. Jasper,* 189 U. S. 439, 446; *Minnesota Rate Cases,* 230 U. S. 352, 433; *Los Angeles Gas Corp. v. Railroad Commission,* 289 U. S. 287, 304. When the legislature itself acts within the broad field of legislative discretion, its determinations are conclusive. When the legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency are met, as in according a fair hearing and acting upon evidence and not arbitrarily. *Interstate Commerce Comm'n v. Louisville & Nashville R. Co.,* 227 U. S. 88, 91; *Virginian Ry. Co. v. United States,* 272 U. S. 658, 663; *Tagg Bros. & Moorhead v. United States, supra,* p. 444; *Florida v. United States,* 292 U. S. 1, 12. In such cases, the judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings, and the question of the weight of the evidence in determining issues of fact lies with the legislative agency acting within its statutory authority.

"But the Constitution fixes limits to the rate-making power by prohibiting the deprivation of property without due process of law or the taking of private property for public use without just compensation. When the legislature acts directly, its action is subject to judicial scrutiny and

determination in order to prevent the transgression of these limits of power. The legislature cannot preclude that scrutiny and determination by any declaration or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the Constitution as the supreme law of the land may be maintained. Nor can the legislature escape the constitutional limitation by authorizing its agent to make findings that the agent has kept within that limitation. Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and impartial, other subservient. It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights have been invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. That prospect, with our multiplication of administrative agencies, is not one to be lightly regarded. It is said that we can retain judicial authority to examine the weight of evidence when the question concerns the right of personal liberty. But if this be so, it is not because we are privileged to perform our judicial duty in that case and for reasons of convenience to disregard it in others. The principle applies when rights either of person or of property are protected by constitutional restrictions. Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority. This is the purport of the decisions above cited with respect to the exercise of an independent judicial judgment upon the facts where confiscation is alleged. The question under the Packers and Stockyards Act is not different from that arising under any other act, and we see no reason why those decisions should be overruled.

"But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. On the contrary, the judicial duty is performed in the light of the proceedings already had and may be

greatly facilitated by the assembling and analysis of the facts in the course of the legislative determination. Judicial judgment may be none the less appropriately independent because informed and aided by the sifting procedure of an expert legislative agency. Moreover, as the question is whether the legislative action has passed beyond the lowest limit of the permitted zone of reasonableness into the forbidden reaches of confiscation, judicial scrutiny must of necessity take into account the entire legislative process, including the reasoning and findings upon which the legislative action rests. We have said that 'in a question of rate-making there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing.' *Darnell v. Edwards*, 244 U. S. 564, 569. The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established. *Los Angeles Gas Corp. v. Railroad Commission*, 289 U. S. 287, 305; *Lindheimer v. Illinois Telephone Co.*, 292 U. S. 151, 169; *Dayton Power & Light Co. v. Public Utilities Comm'n*, 292 U. S. 290, 298." (Italics mine.)

Here, the trial judge may not have agreed with the findings of the department. But he recognized that he had no right to substitute his judgment for that of the department, whose province it was to make this determination.

The judgment of the trial court is correct and should be affirmed.

MALLERY, J., concurs with SCHWELLENBACH, J.